Well, next, your argument in the case of Shoner v. Carrier Corporation. I believe that the appellant is represented by Mr. Matthews. Is that correct? Yes, Your Honor. Very well. And Carrier is represented by Mr. Anderson. Is that right? That's correct, Your Honor. Very well. All right. Mr. Matthews, please proceed. Thank you. May it please the court. Timothy Matthews from the Chimichles Law Firm on behalf of the plaintiff appellant, Nicholas Shoner. I'd like to reserve three minutes for rebuttal, please. Mr. Shoner's air conditioner contains a rust inhibitor, a chemical rust inhibitor that Carrier conclusively determined to be the root cause of a widespread failure epidemic. This chemical creates sticky deposits on a valve that controls the cooling process, resulting in performance loss and often complete failure of the system. This rust inhibitor was applied by Carrier's compressor supplier, Emerson, without Carrier's approval or authorization. When Carrier discovered that Emerson had applied this, Carrier immediately rejected it. It demanded replacements of all of the compressors in its inventory from Emerson. In fact, every manufacturer in the industry did the exact same thing. This was an industry-wide issue, and the entire industry universally rejected it, leaving Emerson with all of these compressors. But Carrier provided no replacements for its own consumers. In fact, it continued to sell the already manufactured air conditioners containing those compressors. Mr. Shoner's air conditioner contains this rust inhibitor, and it failed twice within two years, both times within the warranty. Each time, he did exactly what the warranty tells him to do. First, he contacted his installer, and then on the second time, he contacted another Carrier dealer. On that second failure, the Carrier dealer did what Carrier instructed, which was to inject the system with a highly acidic aftermarket additive called A.C. Renew, which was... With respect, we have read the brief. We know your argument there, but I appreciate your help on something. The... It seems to me that the briefs make clear that your client's air conditioner is working. That may have not been working all the time, but it got, in quotes, fixed. Now, you say that what they injected was not good for it, but it is working. And most of your allegations seem to rely upon speculation about what may happen in the future. If, arguendo, if we find that's not plausibly alleged here, do you have any claim that Carrier breached an express or implied warranty absent the potential future harm that you allege? Thank you, your honor. There's a lot there, so let me try to unpack this a little bit. Okay, all right. First of all, we have alleged current harm, because we've alleged in a non-speculative fashion, in fact, based on Emerson's own testing, that the additive A.C. Renew causes damage. And there's a whole litany of the types of damage that it causes in our complaint. So we have alleged current harm. And you talked about that additive being added. What harm has it caused to your client's air conditioning unit? It has caused dissolving of metals in the system, acidity, fire. Was there evidence that, in other words, was that alleged in the complaint, specific harm to specific parts? Yes, your honor. We alleged in the complaint that the additive causes dissolving of metal, hydrolysis, boiling. I say, I know you say causes, but that's, I'm speaking in the future. I'm saying, have you alleged that the additive has caused, in the past, in the, if I were to open up the unit and look at it, could I see the damage that you say has been caused? So just to make sure your honor understands, this is a hermetically sealed system. This additive gets injected through a port. And so the damage that it causes is internal to the system. In order to see the damage to Mr. Shoner's system, we would have to destroy the compressor. We'd have to take it apart. But that's exactly what Emerson did. Emerson did testing and it tore down compressors, and every single one of them showed this damage. So why was that a breach of the warranty? Number one, if we look at what the warranty says, the warranty says, if you suffer a failure due to a defect, carrier will provide a replacement part to replace the failed defective part. There is no reading of that warranty that authorizes carrier to inject a harmful additive. So right there, you have a breach of the warranty. There's just no way you can read that. And in fact, that's exactly what the District of New Jersey held in the Livingston versus Train case, which was the identical case brought against Train for their air conditioners because they bought these compressors as well. There's also a breach of the implied warranty. And something that's really important to keep in mind is the implied warranty is breached at the time of sale. In fact, you don't even have to give the manufacturer an opportunity to repair it. And we've alleged at least three reasons why this is a breach of implied warranty, any one of which is sufficient to sustain the claim. Number one, we've said that this rust inhibitor was objectionable in the trade. In fact, every manufacturer rejected it. Number two, we've said these products are not of fair average quality because as carrier acknowledged, the rust inhibitor causes failures and it also causes performance loss. Number three, we've alleged that this is not fit for ordinary use. And there, carrier concedes that failure to meet consumer reasonable expectations can be a basis to find a lack of fitness for ordinary use. We've alleged that nobody would have accepted this. These air conditioners don't even meet carrier's own standards. They rejected this rust inhibitor. There is no safe harbor in the implied warranty of merchantability for functionality. In fact, if you look at the words of that statute, the word function doesn't appear there. The UCC drafters created a nuanced list of all of the factors that go into merchantability, not one of which is function. And so, we've alleged at least three and we only need one to survive. And again, in the Livingston versus Train case, the District of New Jersey upheld those exact same implied warranty claims under the UCC under exactly the same facts. So, the fact that the system may be currently functioning doesn't answer any of those questions. It's irrelevant to the implied warranty claim. And as to the express warranty claim, what carrier promised is if it fails due to a defect, we'll give you a replacement part. The additive is not a replacement part. It's ordinarily injecting that would void your warranty. But there's another reason why carrier breached its warranty as well. And that's based on the first sentence of the warranty. The first sentence of the warranty says, carrier warrants its product against failure due to defect in materials and workmanship. That's not simply a repair and replace warranty. That's a quality promise. If you imagine a seller who says, here's my product. If it fails within five years, I'll fix it. Okay, that seller hasn't told me anything about the quality of the product. He simply told me if it fails, he'll fix it. Maybe it'll fail 10 times, but he'll fix it. Seller number two says to you, here's my product. I warrant that this won't fail for five years. And if it does, I'll repair it. That's a quality promise. That seller has said something different. And all else being equal, you would likely buy your product from the second seller, not the first. Carrier breached that part of the warranty too. What matters then is the remedial promise. Okay, what did they say they were going to do if there was a failure? And what they said is, we'll give you new parts. But what's interesting, and this is where we get into failure of essential purpose, is they say to you, if there's a failure due to defect, we will provide a newer remanufactured part to replace the failed defective part. Well, here, the failed part is the TXV. But that's not defective. So if you replace the TXV, you're going to have another failure again, just like Mr. Shoner did. He had, it was- Counsel, for purposes of our argument, let's assume that things are as you described. What notice did you give to the effect that the warranties had been breached? Once again, you have to look at the words of the warranty. The warranty says, when you have a failure, contact your installer or a carrier dealer. That's exactly what Mr. Shoner did both times when he had a failure. The warranty then says, before you pursue legal remedies, within 30 days, you have to send us a letter telling us why you think there's a problem, and essentially telling us what you want us to do. And once again, that's precisely what Mr. Shoner did. He wrote a letter. He told Carrier, the system you sold me is defective because it contains this rust inhibitor. It now has been injected with this other additive, which causes serious damage. The original rust inhibitor still remains in the system and can manifest in a future failure. I want you to provide replacement parts to get all of these contaminants out of my system. And if you don't, I intend to bring a lawsuit. Carrier didn't respond. They blew him off. And so he brought his lawsuit. But again, you have to look at exactly what the warranty says. And he followed it each step of the way. Carrier- Counsel, I'm going to ask you to switch gears. We ask the parties to be prepared to discuss jurisdiction under the Magnuson-Moss Act. And I need you to address that because I think we understand the arguments with regard to the warranty, but I'm not sure I understand how you're in federal court. Sure, Your Honor. First of all, we're in federal court under CAFA jurisdiction either way. So the question, the Class Action Fairness Act. So then the question is, is there jurisdiction over the Magnuson-Moss Warranty Act claim in this court? With respect to the individual claim, so the Ninth Circuit decision in Floyd said to have jurisdiction over a class claim in federal court, you have to have 100 plaintiffs. And we don't. And we said in our briefs, unless the court wants to reconsider Floyd, we're not contending that we meet the class action requirement. But we also brought this as an individual claim. And so the question there becomes really, it boils down to, have we met the $50,000 minimum requirement? And in this court's decision in Fritch versus Swift Transport, the court held that future attorney's fees are included in that. And I'll take a step back for a moment and just note that the court has to look at the case in the form that it was brought. Subsection D3B of the Magnuson-Moss section says, you look at the amount in controversy computed on the basis of all claims to be determined in the lawsuit. Here that included claims brought by two plaintiffs under UCC laws, as well as consumer protection laws. We saw damages, punitive damages, injunctive relief, and attorney's fees. It's really the attorney's fees that get you over that hump. And- But counsel, in this case, if I understand it, your client paid $1,266 for his air conditioner unit. So even the cost of completely replacing that wouldn't come close to the Moss-Magnuson Warranty Act minimum jurisdiction. So then you said it's the attorney fees that cover it. That would be almost $48,000 prorated. Is that plausible? Yes, Your Honor, because we knew from the outset Carrier was not going to settle this case easily. I mean, here we are in the Ninth Circuit arguing a motion to dismiss. We've easily exceeded the $50,000 by the attorney's fees. And we're not talking about in a single case. We're talking about in the aggregate what you're going to end up with in the future. But how do you get to that in an individual case where the amount owed at most is $1,266? Sure. In an individual case, the attorney's fees are not limited to just a percentage of the amount awarded to the plaintiff. In fact, the Magnuson-Moss Warranty Act itself says you can get attorney's fees under the MagMoss Act and it's calculated based on Lodestar. So, but when we are trying to figure out whether your attorney's fees can get you over the threshold, we can only consider an apportioned attorney fees amount for the individual when we're in a class setting. We can't look at the whole class number. So I guess my question is, I'm not sure that you can't meet it, but we have nothing in the record. So normally I think this would get raised at the District Court and the District Court would do some inquiry and there would be some presentation of information or evidence for the District Court to make a judgment. Mike said, maybe you're right that you can meet this even on an apportioned individual basis, but we have no record to show that that's true. So what do we do with that? Well, Your Honor, and that's an issue we acknowledge in our brief. At the time of the briefing, which was 2018, the common understanding based on this court's Birdsong case was that CAFA jurisdiction was sufficient. And as long as you had CAFA jurisdiction, you could get the MagMoss jurisdiction as well. The Floyd case came out much more recently. The first time it was ever raised was in defendant's appeal brief here. And so we think we've- Of course, this is subject matter jurisdiction, so we can't really say it's waived. Correct. But we think we have pled it. We think we've adequately stated facts that the court can reach that conclusion. And even if not, it doesn't affect the jurisdiction of the court because the court has jurisdiction under the Class Action Fairness Act. And we've stated, expressed, and implied warranty claims. And you still believe you have CAFA jurisdiction? Yes, Your Honor. We do still have CAFA jurisdiction. And I see I'm out of time. Indeed. Very well. Let's hear from the other side. And we may give you a little bit of time for rebuttal here. Appreciate it. Thank you. Thank you, Your Honor. And may it please the court. Devin Anderson from Kirkland & Ellis on behalf of Carrier. As Judge Schneider correctly recognized, what ultimately matters for Mr. Shoner's warranty claims is the absence of any allegation that his unit is failing. Mr. Shoner clearly doesn't like Carrier's decision to use an additive to resolve any buildup on his TXV valve. The question is whether that plausibly states a claim for breach of warranty. It does not. As to the written warranty, that warranty offers a limited remedy when a part fails due to defect. It is not, under Michigan law, a warranty that the product was defect-free or even contaminant-free. When Mr. Shoner had... Counsel, I mean, we've read the express warranty and agree it's limited, but it seems like what was done on the second go-round was not what was promised to be done because the warranty simply says that you're going to replace a defective part, not repair it or alter it in some way. And that's not what was done. So how have they not fled at least an express warranty violation? Because you have to look again at the terms of the express warranty and he does not have a current failing part. When the part failed, that he alleges, it was fixed. It was treated with the additive. But you didn't... The warranty wasn't, we'll fix it. The warranty was, we'll replace with a new part. And so at that moment, how would they not have an express warranty breach? Well, so I want to come back to what counsel for Mr. Shoner said. The alleged defect here is not a physical component, right? You heard counsel for Mr. Shoner say that the TXV valve, where the buildup occurred, was not defective. Neither is the compressor. The compressor is working fine. There's no allegation that the compressor is failing. What the alleged defect was, was this rust inhibitor and the way that it interacted with other chemicals in the unit to create this gunk, for lack of a better word, that fell out at the TXV because that happens to be the point of location where the phase change occurs in the refrigerant from a liquid to gas. And so what Mr. Shoner is saying is the fact that Carrier chose a remedy that directly attacked the actual issue is somehow a breach of our warranty. But I think that gets it exactly backwards. If we had just been replacing the TXV ad infinitum, as Mr. Shoner's counsel said today, that actually wouldn't have fixed the issue. And so I think it's completely reasonable to read Carrier's warranty to allow it to attack the actual issue here, which was the gunk that formed on the TXV valve, which there's no dispute the additive did. So your answer to Judge Forrest's question is, no, we shouldn't read the express warranty, per its word, that you would replace the defective part. We should read it that you could put whatever you wanted into the system to make it work, end quote. Is that right? I don't think that's exactly right, Judge Smith. I think what is it? Our, yeah, our argument, I want to come back to the text of the warranty. The warranty refers to a failed defective part. There's not a failed defective part alleged here. There is a failure. And then there is the Rikonox that fell out at the TXV and created the gunk. But the TXV is not a defective part. The compressor is not a defective part. The compressor never failed at all. So the question is, how do we read the warranty in this circumstance where the issue is actually not a defective part, but a chemical contaminant that created that gunk on the TXV valve? And I think it's entirely reasonable and appropriate to read Carrier's warranty to allow it to directly address that issue, which there's no dispute that it did. Otherwise, if we were just replacing TXVs over and over and over, as Counsel for Mr. Shoner said, we'd start to run into failure of essential purpose territory because we're not actually addressing the issue that's behind the failure. And that's why Carrier fully complied with its limited warranty obligations. I want to come back to something that Mr. Shoner's attorney said, which was that Carrier warranted that its product is defect-free. That's incorrect as a matter of Michigan law. And the Grosse Pointe case, Grosse Pointe v. Jaguar, that Mr. Shoner himself cites, makes clear an unadorned promise to repair or replace a defective part is not a promise concerning the quality or performance of the goods to which the goods can conform. And so Michigan law makes clear this is not, the Carrier's warranty is not a promise that you're getting a defect-free product. It's not a promise that you're getting a contaminant-free product. It's a promise that if it fails, we will address it, provided you give us the opportunity to do so. So there are two conditions necessary to invoke Carrier's express warranty obligations. A part that failed and giving Carrier the opportunity to address it. Michigan cases are consistent on this, and you didn't hear a single Michigan case invoked by Mr. Shoner's counsel in his argument. If the warrantor fixes the product and restores it to operation when the warranty obligation invoked is invoked, there's no breach. That's Gorman v. American Honda, and that's the Computer Network case that dealt with the Hummer. Well, I want to jump in because I want to make sure I'm understanding. So if your argument is that that second intervention, we'll call it, isn't a violation of the express warranty because the express warranty hadn't been triggered, there was not a defective part, then I guess my question is, so on what basis did your client do that second intervention? Was it for customer goodwill? Was it for an implied warranty basis? I mean, if you didn't take that action because you were obligated to under the express warranty, why did you do that action? So the second intervention, this is the, I think, summer 2016 intervention, Mr. Shoner alleges that there was a failure. He says his evaporator coil began to freeze. I think the warranty language that I was talking about, Judge Forrest, was referring to a failed defective part, which doesn't really fit with what happened here. No, I get that. So if you didn't address the second failure because of the express warranty, why did you do it? Did you have some other obligation or was it just because of customer goodwill? I think Carrier always prides itself on having customer goodwill and it wanted to make available to people that experienced this issue, which were a relatively small number of incidents, that a remedy that actually attacked the problem underlying the frozen evaporator coil that Mr. Shoner experienced. Again, if we had just been replacing the part that's not defective, we're not actually addressing it. And so Mr. Shoner seems to want to have his cake and eat it too by saying, well, they had to replace parts, but then if they were replacing parts, that we would be failing, our warranty would be failing of its essential purpose. That cannot be the case. It's nonsensical to find that a warranty against failure failed of its essential purpose when the unit was restored to operation and is no longer failing. I want to turn to the breach. Before you do, I want to be sure of your answer to my colleague. Are you saying that in the second plane, there was reference to a specific part, i.e. the frozen evaporator part, whatever it was, and that was something that did trigger the warranty. Is that right? I think there was a failure in that circumstance, Your Honor. I think we've argued that they did not actually contact carrier, which is the other precondition to invoking carriers warranty obligations. But we're not disputing that the second instance when there was the frozen evaporator coil is a failure. I think what we're arguing... That was a failure of a part, right? Right. So the evaporator coil froze over. That's right. But the evaporator coil isn't alleged to have been defective here, right? And so I want to come back and it's important to understand what the actual alleged defect is. It's the chemical buildup on the valve. And I think we have to read carrier's written warranty to allow it to actually address the problem at issue. Turning to the breach of implied warranty, the implied warranty of merchantability is that the good as sold can deliver a basic level of functionality. That's computer network from the Court of Appeals of Michigan. That's the guaranteed construction case. It also must be read consistent with the written warranty. An HVAC experiencing a failure that was then restored to operation under a written warranty is not a merchantable. Mr. Shoner's unit worked for over a year and continues to cool his home after being treated with the additive. No Michigan case that we're aware of and that's been cited by Mr. Shoner has ever found a breach of the implied warranty of merchantability where the product is currently working and where the plaintiff hasn't identified a single unit anywhere, let alone his own, that has experienced a malfunction or failure due to the repair he's complaining about. We have to, in other words, under the UCC as incorporated in Michigan law, read the implied warranty consistent with the written warranty. Otherwise, the concept of a limited warranty, which allows a manufacturer to limit its obligations to repair or replacement, wouldn't have any meaning because anytime a good contained a failed part or experienced a failure, you'd have a breach of the implied warranty and usurp the limited warranty obligation that the manufacturer offered. There is no Michigan case that has ever held that and there are plenty that point in the opposite direction. Again, I would turn this court's attention to the Gorman case from the Court of Appeals of Michigan. There, that was an instance involving an Acura where multiple repairs were performed and yet the court expressly ruled that there would be no breach of the implied warranty of merchantability. The operative fact in that case and the operative fact that's missing here, or I guess that's also present here is that the plaintiff's Acura was returned to service after those repairs. The Zanger case, which we cite in our reply, is another example of this. There, the plaintiff experienced problems with the RV Chasey and had to bring the motor home in for repairs twice. Again, the court said there was no breach of the implied warranty. The common thread through the Michigan merchantability cases isn't that a repair is necessary for there to be a breach of the implied warranty of merchantability. It's that there were so many repairs needed and so many different issues and the product was out of service for so long that the product is really closer to a lemon than a functioning product. Again, at the Computer Network case involving the Hummer, where the Hummer had to be taken in for 17 different repairs and multiple malfunctions. There, the court said that's a breach of the implied warranty of merchantability because the vehicle was out of service for so long. There were so many different repairs. We know that it is not functional. The International Financial Services case, again, cited in Computer Network. Counsel, before you run out of time, would you address the jurisdiction issue, please? Absolutely, Judge Forrest. So I think the class issue has already been conceded under Floyd that there is no subject matter jurisdiction over Mr. Shoner's class action claims, but there's not subject matter jurisdiction over his individual claims because he doesn't meet the amount and controversy requirement contained in subsection D3. Shoner pleads, as Judge Smith noted, at most that he's out potentially the purchase price of the air conditioner, which is about 1200. As for attorney's fees, every circuit court that has addressed the issue has held that attorney's fees are costs that are excluded from the amount and controversy requirement under the Magnuson Moss Warranty Act. I'm happy to read the citations to the court now, or we can submit a letter after argument so that people don't have to take notes. But every circuit court that we've found that has considered this question has held that attorney's fees are excluded costs. That's the Second Circuit, Third Circuit, Fourth Circuit, Fifth Circuit, Seventh Circuit, and the Eleventh Circuit. And those cases are, again, we can submit a letter after argument citing those cases. And that makes sense as those cases read. If you look right above subsection D3 to subsection D2, that's a circumstance where attorney's fees are expressly included in the definition of costs and expenses. And so when we come down to subsection D3 and we see the same word used, attorney's fees should be included in the definition of costs and therefore excluded from the amount and controversy requirement. That ensures that the other provisions of the Magnuson Moss Warranty Act have meaning. If you look at subsection D3a, it sets a $25 minimum amount and controversy requirement for an individual cause of action. That would have no meaning if the amount and controversy necessarily included attorney's fees because you're always gonna probably clear that $25 just with the filing of a complaint. It's also consistent reading the amount and controversy requirement to exclude attorney's fees with the general restrictive nature of the Magnuson Moss Act that this court recognized in Floyd. Now, counsel for Mr. Shoner cited this court's case in Fritch, but Fritch did not address the Magnuson Moss Warranty Act. It addressed CAFA, which does not have a provision that includes costs that includes attorney's fees and costs. And so the specific statutory language in the Magnuson Moss Act must control here. Floyd itself recognized that there are different amount and controversy requirements in CAFA and the Magnuson Moss Warranty Act. So just let me be sure that I understand your point. You say there is no jurisdiction under the Magnuson Moss Warranty Act because you're dealing with an individual here. You got the purchase price. You cannot include the attorney fees based on the cases you say you're going to cite. What's your position with respect to CAFA? Your opponent says that we have jurisdiction because of CAFA. What's your position? We don't dispute the existence of CAFA jurisdiction over the remaining state law claims, Your Honor. But we do argue that the court, especially in the wake of Floyd, lacks subject matter jurisdiction over the Magnuson Moss Warranty Act claim because as Floyd recognized, the requirements in D3 are jurisdictional. They use jurisdictional language like cognizable as opposed to claim processing rules. And so for this reason, we would ask the court to affirm the district court's decision dismissing the complaint. Thank you, Your Honor. Any other questions of counsel? Very well. Now, we took you right up to the end of your time, Mr. Matthews. We'll give you a minute to respond. We'll try not to ask you any questions, but we may anyway. So go ahead. Okay, thank you. Number one, Mr. Anderson and I have both pointed out to the court that taken literally, the carrier warranty is problematic here. That's exactly where the failure of essential purpose doctrine comes in. Under that doctrine, where due to unanticipated circumstances, the warranty deprives either party of the value of the bargain, the UCC says you apply regular UCC remedies. You can then resort to the UCC. And that's what we have, unanticipated circumstances that make this warranty impossible to apply literally. Number two, Mr. Anderson said that he acknowledged that the additive attacks the clog. The additive attacks much more than the clog. It attacks the entire inside of the hermetically sealed system. This is a motion to dismiss. The court can't resolve all those fact issues on a motion to dismiss. The question is simply whether we've alleged a plausible claim under rule eight notice pleading standards. We clearly have. Under the Magnuson Moss Warranty Act, I would advise you to look at the difference between costs and expenses in the statute. Expenses is attorney's fees, costs is not. Jurisdiction doesn't turn on expenses. But counsel, your opponent says there are multiple circuit court decisions that say you don't count attorney fees for purposes of determining jurisdiction under Magnuson Moss. What's your response to that? Well, your honor, we haven't seen those decisions because they haven't cited them. But I will take a moment to explain my last point a little clearer. If you look at subsection D2 of the statute, it refers to costs and expenses. And after the word expenses in parentheses, it says including attorney's fees. That's subsection D2. The jurisdictional section is D3B. And that simply refers to, to, sorry, interests and costs. It doesn't say expenses. So when the Magnuson Moss attorney, sorry, when the Magnuson Moss Act refers to attorney's fees, it calls them expenses. When it refers to the jurisdictional issue, it talks about interest and costs being excluded. Costs is different from expenses. As we all know, costs are costs. They're, you know, taxable costs. Does that mean expenses are included? So that means that for purposes of the jurisdictional issue, attorney's fees are included. And I'll point out that although Fritch was not a Magnuson Moss case, it was a CAFA case, the Ninth Circuit specifically rejected the Seventh Circuit's decision in Gardinsky, which was a Magnuson Moss Act case. So the Ninth Circuit rejected that viewpoint in Swift by rejecting the Gardinsky Seventh Circuit decision. All right. Very well. Any other questions by my colleagues and Mr. Matthews? Thank you. Very well. Thanks to both counsel for your argument in this case. Interesting issues that we will, this is now submitted, and we will decide the case as soon as we can. Thanks to you both.
judges: Kelly, SMITH, FORREST